Good morning, Your Honors. Frannie Forsman, Federal Public Defender, appearing on behalf of Thomas Williams. Mr. Naylor, who represents Mr. Mitchell and I, have divided our 20 minutes. I'd like to reserve two minutes, if I may, for rebuttal on my issue. Our issues are separate. I think the first difficulty that faces this Court is to determine exactly what basis the Court ruled that the evidence of the Denmark, unconvicted Denmark fight, came into the evidence in this case. The one thing we do know from the judge is that he repeatedly and consistently ruled that the evidence was not inextricably intertwined. We know that he did not rule that it was admissible under 404b. In fact, the prosecutor throughout the trial said that he was not offering it under 404b, although they revived that now on appeal. Well, if it's relevant on any basis that appears in the record, of course, we can affirm. I'm sorry? If it were relevant and not unduly prejudicial on any basis appearing in the record. I recognize that, Dr. Judge, although I would tell you that this Court does that, but not when the Court has specifically rejected it and not when the prosecutor has specifically withdrawn that as a basis for the admissibility evidence. But I think the most important thing here is that throughout these proceedings, this judge said the 403, this evidence fails under 403. He even said it at sentencing. He said it throughout the trial saying that this was unduly prejudicial. Well, yeah, but he then, after, at the end of the day, he made a finding that it was not unduly prejudicial. He did not. I could not find that in the record. Well, it's on, at least I found it, in a transcript on page 113 after Mr. Kennedy had made a prejudicial pitch. He says, but all the evidence, all evidence is prejudicial to one side or the other. It's got to be unduly prejudicial, and I don't think it is. He's talking, right there, he's talking about a specific piece of evidence, I think, Judge. That's and that was, no, it was before he actually, that's the, if that's on page 113, then that is before he actually ruled that it could not come in under 404b. If I don't have 113. Well, let's, forgetting for a moment what the judge did or didn't do, just help me through why the Denmark evidence doesn't have a tendency to show how come it was that Middleman recommended Williams to Mitchell, and why Williams, when he took this fight, didn't know that he was taking it to throw the fight instead of to fight it out. Two issues there. First is, is that the issue of why Middleman hooked up with Mitchell and then Williams is not really an issue in the case. They put on evidence from 11 different boxers, 11 different boxers, to say that this is what, I was approached, this was what I did, I went into the ring. This was all in order to show that Mr. Mitchell was involved in the conspiracy of fixing fights. When Mr. Johnson, the prosecutor, was asked, well, why don't you have to show the why, why isn't there a gap in the evidence to show why they were approached, he said, well, they're not on trial. Well, I mean, that's true enough, but focus on Williams and why it's not, the evidence wasn't relevant. His position was, look, I took a bad punch, the first puncher, the first good punch that was thrown, I sailed through the ropes. And that was because it was a good punch. I didn't know it was a bribe. He said that. No, no, that was not his position, Your Honor. It was not his position that he didn't know it was a bribe. It was his position was that it was not a fixed fight, not that he didn't know that somehow this money was for something else. I mean, I think that's really important, because the jury was not. Do you see what I'm saying? I mean, maybe I'm not, maybe I'm kind of mistaken, is that, is that the point was is I don't understand how you can say on the one hand it's not a fixed fight, I mean, that it is a fixed fight, but it wasn't a bribe. I mean, he said he wasn't bribed, not that he didn't know it was a bribe. This isn't a situation in which, for instance, someone would have handed him some money and he says, well, I didn't know that it was a bribe. I thought it was for something else. I mean, the issue in this case was whether or not it was a fixed fight, whether or not he agreed to go in and lay down in the fight. If this kind of evidence can come in under this, wasn't it extremely refined? Why isn't evidence that he got paid to do the same thing in Denmark as he got paid to do, although a little bit less, in Las Vegas, relevant to show that he knew he was being paid to take a dive? Judge, let me use an analogy, if I can. If we were to do this, because this is an unusual case. We don't have fixed fight cases very often. Thank heavens. Kennedy, but there's not very many cases. I'm sorry? We have lots of fixed fights, but not very many cases. Well, the – I'm not a boxing lawyer, what can I say? Let's take this and put it in a more common context of a drug case. If this were a drug case, as Vizcarra-Martinez was, for instance, would we be able to put in the evidence, would we be able to say, why did you send the confidential informant to go see this guy? Well, I sent the confidential informant to see this guy because he did – I know he did an unrelated drug deal. Yeah, but let me go back to this. I'm on the same set of points, really. I'm looking at 404B, and the evidence is admissible to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. It seems to me that this evidence that the Denmark fight qualifies under 404B. What we have is a story of a fighter who's gotten lazy, who misses a couple of fights because he refuses to train. There's some – why is he in a position to want to fix fights? Well, it's because he's gotten lazy, and that fits into the pattern. It seems to me that it qualifies under 404B. And then the question is unfair prejudice under 403. Which the judge found it was unfairly prejudicial. And that's why the judge would not admit it under 404. And then the prosecutor – I think it's important when the prosecutor says the fact that the fight in Denmark was fixed is not relevant. That's what the prosecutor in this case said. It is not relevant that the fight in Denmark was fixed. Well, if it's not relevant, why does he spend almost all of his time at closing arguing about the – talking about the fixed fight? Because he eventually wore the judge down and got it in, and it's propensity evidence. And what it caused the jury to do was to believe, as Judge Mahan ruled initially, it will cause the jury to believe if the SLB did it the first time, then we'll believe the SLB did it the second time. Which is the point of the second part of the 404B analysis. I would direct the Court to Excerpt of Record 231. This is Mr. Johnson's quote. The fact that he threw other fights is not relevant. The judge found that the Denmark fight was of marginal relevance. And then the judge went on to find that it was prejudicial, saying that even up to the point of the sentencing hearing. So even if this Court were to find that despite the fact that the prosecutor said we're not offering it for that purpose, despite the fact that the prosecutor said it's not relevant for that purpose, if even if this Court were to find all of those things, in order to be – you would have to go in and do an independent review of prejudice based upon what this judge found, listening to all of the evidence, that it was unduly prejudicial. I think this judge believed that DeGeorge stood for some new principle, which was that even if it's not admissible under 404B, even if it's unduly prejudicial, and even if it's not inextricably intertwined, which were all of his findings, even under all of those circumstances, for some reason it comes in to allow the prosecutor to complete the story, which is the basis on which Mr. Johnson repeatedly said was the only reason he wanted it in. No instruction can protect against that, particularly when in final argument, as you've pointed out, Your Honor, particularly when in final argument, that's exactly what they argued. We went to him. This is the statement of Mr. Johnson as to why he wants it in. Mr. – in order to show that Mr. Williams was essentially selected because Mr. Mitchell had information that Mr. Williams was an individual who was a fighter who was – would potentially able to take a bribe. If that's not a definition of propensity evidence, then I don't know what is. And that's on Excerptive Record 224. Excerptive Record 231, the fact that he threw other fights is not relevant. What's relevant is – Kagan. The problem is, of course, it's always going – I mean, any prior similar bad act is almost by definition going to have a potential for being character evidence, propensity evidence. Correct. But if it has another relevant purpose, that essentially doesn't matter. But I don't know how you can ignore what the government's position was on that. It was, I don't know how you can just simply say that the government can come in and convince the court, wear the court down after three different rulings. Well, wearing the court down, I mean, you know, things changed. I mean, they came in and they had Middleman, who was going to testify, turncoat and was going to testify. So something changed. And, you know, those rulings are always subject to change as the evidence evolves and the judge's perception of probative value and prejudicial effect changes. That – that – I'm sorry, my co-counsel is reminding me of the time, and I do want to reserve a little bit of rebuttal time. But if I could just say, they – this, the statement that I just gave you from Mr. Johnson, that statement was made before Mr. Middleman pled guilty. So he – they knew about Middleman. They knew this stuff. This was not new information. Okay. Mr. Naylor. Hi there. Tom Naylor, Henderson, Nevada. I represent Bobby Mitchell, who's the promoter and manager in the case. I noticed the flyer had him listed as a boxer, so I wanted to correct that for the audience. I'm first going to deal with the motion to suppress the Shelby gross recordings. I think you have to start first with the actual wording of the statute. It basically, Title 18 U.S.C. Section 25112d says, So we have a clear congressional ban on this type of evidence coming in. If you look at the — Well, the difficulty is not what the statute says for you. The difficulty is that after an evidentiary hearing, there's a fact-finding that Gross, who did the taping, did not do so with a tortious purpose. Well, Your Honor — He didn't do it to get back the $2,500. He did it in order to protect himself and get out of the contract, after Mitchell said he should — he wanted him to take a fall, too. Well, Your Honor, we did have an evidentiary hearing, but I believe the magistrate incorrectly looked at trying to find a primary motive versus secondary or third motives, and as the — The magistrate judge said Gross' purpose was, his purpose was to — was because of the contract, not to get back his $2,500. Well, that's true, Your Honor. That's why we have de novo review to go through all the facts. I've never heard of de novo review of facts. I believe there is de novo review. In the evidentiary hearing, our review is to see whether there's any support in the record for the fact-finding. Well, Your Honor, I would submit that the Court was looking at that fact and using a wrong standard of law in looking at the primary purpose, where the Ninth Circuit has — has stated that you — that there can be more than one purpose, and if you have an illegitimate purpose and a legitimate purpose, the fact that there's two purposes I understand that the magistrate found there was a legitimate purpose, and that was the only purpose behind Gross' taping. Well, he also found, from the record, Your Honor, that Mr. Fink, who helped set up the initial tape, had an illegitimate purpose to get that tape recording in order to preclude Mitchell from recovering on any judgment he might give them. And of course — Sure. Fink's purpose was irrelevant. He didn't do the taping. Well, he was there setting up the material. So if I'm conspiring with someone else to basically set up an extortionate plot, that well comes within the purview of the statute. And then I would submit, Your Honor, that I argued extensively to the magistrate that the $2,500 advance fee and also the fact that the attorney also testified that Mitchell — he wanted that tape to hang over Mitchell's head because we only had one year left on the contract. If you might, I might want to move to the — to the Abdullah-Muhammad issue concerning the prior felony conviction. Here we had a conviction right on point, a deceit conviction, which is very important and has been recognized by the courts as being a high-level conviction to omit an evidence. We had a critical witness, Muhammad, who was the only person who implicated Melillo, Sr., the former highly decorated New York policeman. And so we needed that conviction to impeach Muhammad. But also note that the conviction was in 1993, and the trial — the indictment came down in 2001, but for the fact that the case was not moved aggressively by Mr. Mitchell's prior appointing counsel, who, unfortunately, had a substance abuse problem so great that they — he didn't even show up on the day the trial was supposed to commence and sent another attorney and then had to surrender his license to the bar before I picked up the case, that would have come in within the 10 years. And I think — I cited a case, the Mullins case, where a defendant flees, and they go beyond the 10 years, and the defendant takes the stand. The judge allows the tolling to take place of the 10-year thing, and they allow the impeachment conviction to come in. In this case, it was abuse of discretion by a district court not to have a similar tolling provision apply to Mr. Mitchell. It wasn't Mr. Mitchell's fault that he got appointed an attorney who had a substance abuse problem, and therefore, the case goes beyond the 10-year limit. That's why I argue in the brief that if the court should reverse, that this court adopt a 10-year from the date of the indictment and not from the date of the trial. That way, you get rid of all the playmaking as to when the statute should run or not. My last issue concerns the comment made by the court at the end of the defense case concerning the need for any rebuttal witnesses. I state that in the record, that he basically made the statement, what's the status of a rebuttal witness, and then he says, you don't need any. And that's right after the defense is closed, right after the defendant has testified in the trial. I argue the court, that's a clear error, due process issue. No judge should make such a comment in front of the jury. The prosecutor makes the argument that it was unnoticed. It was noticed. I was sitting directly across from the jury. It was L courtroom, and I had the courtroom and the jury. I looked at them. They were shocked. And the record doesn't reflect, because it's a printed record, that there was a pause after the judge made that comment, and the prosecutor is saying, well, I don't know, Your Honor. Then he goes, it's a joke. That's a joke. I think that's a clear error, and it leaves the jury to believe that the defendant is guilty of the infringement. There was no objection. That's correct, Your Honor. There was no objection. The reason is, and we're going to make a motion the next day, and we decide to take it up on clear error, is that he didn't want to – he saw what happened to the court. He didn't want to push the judge any further. He thought if we made such a record that he'd be taken out on sentencing. And that's why no objection was – or motion was filed. Does the Court have any questions? I'd like to reserve two minutes. No, I think not. Ms. Willis. Good morning, Your Honors. First, I would like to start with the judge's ruling on the Nielsen fight, the Denmark fight. And, by the way, I was the co-prosecutor in this case, so I was involved in the trial and actually gave the closing argument. The judge made it very clear that initially, after weighing the evidence, and this is, of course, without the testimony of Robert Middleman, that 403, undergoing the balancing, the evidence of the Nielsen fight was too prejudicial because he felt like it then just solely went to character. However, once Middleman came into the picture, and before Middleman came into the picture, the Nielsen fight evidence would have only been introduced through George Peterson and through the statements of Williams, the references he makes to the Nielsen fight in the recordings. Okay? So once you have Middleman coming into this case, that changes the complexion of it entirely. And what the judge found is that under the DeGeorge inextricably intertwined case analysis, which is separate and apart from 404B analysis, that it fell within the second prong of inextricably intertwined evidence. And that is, with Middleman and with the Nielsen fight evidence, now we had an explanation that the government had to make to the jury about how these people fit together. And I think that in that way the problem is that that could have been accomplished by allowing Middleman to testify that he had previously managed Williams. Right? Actually, he had not. Well, he had had a previous arrangement with Williams, or he knew him before. I mean, was it necessary and not unduly prejudicial to go into the fight itself, into a previous fight fixed? It was, Your Honor. And here's why. Because of the interrelationship between these people, and it was condensed in such a small time frame. You have the Nielsen fight occurring in March of 2000. So March. Then we go to the top of the ladder, because I view this whole conspiracy as like a ladder, with each boxer being a step toward the promotion of the top step, which is Richie Melito, Jr.'s career. The managers and promoters buttressing those steps in the ladder. That fight, the Melito fight, is in August of 2000. Okay? What the Nielsen fight did is it explains why Mitchell, who'd run out of boxers, he'd run out of heavyweights, and remember, we've got to have him because we've got to make Richie Melito, Jr. look good. He calls Middleman. And the testimony of Middleman, and I did his testimony. I presented that witness. I tried to set it up. And the way the record reads is that we have the contact by Mitchell. There's no other explanation for Mitchell to contact Middleman under these circumstances but for the fact of a thrown fight with Nielsen. So we have to be careful. And that's what I'm trying to get at here, is that there's no other way to get into 404B that shows on behalf of what's Williams' motivation, or why is this more than simply propensity, or does this explain knowledge, intent, and so on, on the part of Williams? Your Honor, that's correct. It is, I think, textbook 404B evidence if you're going to analyze it under that rule. It's just that the judge and this is an abuse of discretion standard. And what do we do with the fact, and at least it's been represented, that you argued that 404B was not the basis for getting it in? The judge had rejected the 404B evidence under 403 prior to the introduction of Middleman. Once Middleman came in and we showed the judge the DeGeorge line of cases, that analysis, the judge was comfortable that this explained the time, the purpose, the circumstances of the relationships of these parties. Because we're not only explaining Williams. We're explaining why Middleman is acting in the way he does, not just in making these arrangements, negotiating this with Williams and then with Mitchell, but also the extortion, the calls that Williams is making. Why is Middleman paying this man's rent? Why do you have Mogens Polly, who is the trainer for Brian Nielsen? Why is he contributing to the David Chesnoff Law Fund to give Williams a defense? You will be able to explain that. All those seem to be perfectly relevant to 404B, but you weren't arguing 404B. The basis that the Court made, and it is an abuse of discretion, under his discretion, he chose to bring it in as inextricably intertwined evidence. Kennedy. But what if we do an abuse of discretion standard when the judge's reasoning is wrong? That is to say, it's clear that we can affirm on any ground, but does it change the degree of deference we give to the district judge when it looks as though the district judge, if he had thought of it as a 404B and then thought of it as a 403 unduly prejudicial standard, might have gone the other way on the prejudice standard? I understand, Your Honor. And it is a de novo review as to whether or not the judge properly brought it in under inextricably intertwined or 404B. Once he ---- But my question is a little bit different from that one. Okay. If the judge had said, I am admitting this evidence under 404B, and I further find that it is not unduly or unfairly prejudicial under 403, we clearly defer its abuse of discretion. But what if he doesn't say, I'm admitting it under 404B, and he doesn't say, I find it ---- I do not find it unduly or unfairly prejudicial. In fact, the only things he seemed to have said is, I'm admitting it because I think it's inextricably intertwined, even though it's pretty prejudicial. Yes, Your Honor. So does he get abuse of discretion review from us at that point when his reasoning is quite the opposite reasoning from that in which I would be inclined to affirm? Your Honor, yes, he is entitled to abuse of discretion. Even though everything he said is wrong? I don't ---- he didn't say ---- he characterized it as not inextricably intertwined. I think that that was a misstatement because he was kind of lumping in that phrase with the first prong of inextricably intertwined evidence. What he was saying is that it's not part of the charged conduct. However, under the second prong of admissibility for this type of evidence, it's contextual evidence. And there, I think that you have to give him an abuse of discretion standard. Now, I submit to you, if you find that he was incorrect under De Novo, that it should have come in under 404B, this transcript, this case, this is textbook 404B evidence because the government had to show that Williams intended on entering into an agreement that would promote the boxing career of Richie Melito by taking a dive. It showed his motive for doing so. He was hungry. He wanted money. He was lazy. He felt he was washed up. It showed his scheme and purpose in trying to distance himself from George Peterson because there was ---- Mitchell had no business dealing with Williams. Middleman had no business. Williams and Peterson had a contract together. So, again, the Nielsen fight, and I would submit, using the contextual analysis under the second prong of inextricably intertwined evidence, that also explained the conduct of George Peterson and Williams toward him. It also explained why Mitchell was contacting Middleman, why Mitchell was trying to get Williams away from Peterson. Even Williams, if you look to his recordings, he even confuses the Melito fight and the Nielsen fight. It's all the same to him because we're not dealing solely with character or propensity evidence here. Yes, it's a bad act, but the relevant, the probative purpose of it is to show why these parties in this very short timeframe were dealing with each other in the manner in which they dealt. This is outside, I have to say, what's immediately in front of us. What has become of Melito, Jr., Melito, Sr., and so on? Your Honor, Melito ---- If there are some bad people in this story, they're not limited to the people now in front of us. I don't know what's become of Sr. Sr. had returned. Was either of them ever prosecuted? No, sir. The only evidence ---- Why not? Well, okay. I knew you were going to ask me that question. I've thought about this a lot. First of all, the only evidence ---- I mean, they're the guys who are paying the bribes. They're the guys who are fixing the fights for their own benefit. We've got a bunch of poor schmoes here. I don't think I would characterize Mr. Williams or Mr. Mitchell as a couple of schmoes. There were a lot of really hard-up boxers, and they were either not prosecuted or they were given immunity, and then Mr. Muhammad pled guilty. But Jr. is running a pizza restaurant in New York. He never boxed again. And was never prosecuted. I don't think he knew. And how about Dad? Dad was never prosecuted? Dad was never prosecuted because the only evidence that the government had with respect to Dad was Muhammad. And I don't think that we could have convicted just based upon Muhammad. And that would certainly address the 10-year rule on this prior conviction of Muhammad's. How much more impeachment did you want? Mr. Muhammad is a convicted felon for guess what? Bribery. Sports bribery. He was impeached thoroughly. He testified about his bringing these boxers in. Yes, he did bring in Sr. But, Your Honor, don't punish the government because we felt like we couldn't prove beyond a reasonable doubt that Sr. was part of this scheme enough to convict him. And I honestly, and this is my personal opinion, Your Honor, I don't think that Jr. knew. Maybe he should have. But I think this kid, you watch tape after tape of him boxing. I think he just wanted to be a winner. And his dad was going to make sure that that happened using these managers and promoters to do it. If my, let's see, the last thing, I think the court, I don't think there should be any questions about the gross, the standard of review on this gross case would definitely be clearly erroneous. The magistrate judge, who was affirmed by the district court judge, found that the only evidence of a second motive or an illegal motive would be from Mitchell, and he found Mitchell not to be credible. I do want to say, though, that going back to the Nielsen fight, if the court is so inclined to reject the judge's basis, as the court has said several times today, you can affirm, based upon finding that it fell within 404B. We didn't. I'll stop at that point. If there are no other questions, I'll submit. Kagan. I don't think so. Thank you. Ms. Forsman. Your Honor, the – I'd like to address the – just first, there's two things that Mr. Naylor would like, just a couple of seconds, so I'll try to move quickly here. The problem that you would have in moving to 404B to affirm the decision of the court is not only because he got everything, the judge got everything wrong and you have nothing to review, and I know you can affirm on a separate basis, but the problem is, and I would refer you to page, to excerpt of record 548, as of the end of the trial, that's in the sentencing hearing, the judge is explaining again the reason why he lent the evidence in, and he said, I find that it was more prejudicial than probative, but I let it in under DeGeorge. If the judge had just done what happened in DeGeorge, then I think you might be in a better position to be able to affirm him. The court limited that evidence greatly in DeGeorge so that it was just the evidence that went to what needed to be explained. That's not what happened here. The only other thing I would say is there's probably no more hard-up boxer than Thomas Williams. He was a $5-an-hour janitor. So if we're going to talk about the people, then we should talk about him as well. I'm sorry to delay. You gave me a page number. Is excerpt of record 548? 548 in sentencing hearing. And what line is that? I've got 548 here in front of me. It's your excerpt of record? My excerpt of record. Yeah. I'm looking for it. Judge, if I could go back and get the volume again. That's what I have in my notes. Don't worry. I can find it. Mr. Naylor. Just a quick comment. I think the fact that Malieu Sr. was not prosecuted was a big element in this case. And that was our big one of our big arguments in closing is basically the main actor was not prosecuted by the government. And that's one reason. In Abdullah Mohammed's testimony, he was the only person and he had the government say that that's not credible enough to convict Mr. or to bring a grand jury indictment against Malieu Sr. Well, that's why it was important to get that impeachment evidence that he had a prior felony conviction for deceit in. And that's why it was such an abuse of discretion not to allow that in. That would have shown the jury not to trust him at all and that he had a prior conviction for deceit prior to the admission to guilt in this case. The second point I just want to make, since we joined in the motion on the Nielsen fight, is that in 404B, you have to prove there is another fixed fight. And the thing is the judge never really, do we ever prove there's another fixed fight? The only people who said there was a Nielsen fight was fixed was Middleman, who had already made a deal with the government. You had some admissions as to Williams saying it was fixed. We also had testimony that's sometimes something people say, well, I didn't fight good, I laid down for the guy, that type of thing. What independent evidence? We have no films. We have no findings by Denmark or anybody else that the Nielsen fight was ever fixed.  18-20. 18-20. Okay. Thank you very much. Thank you, counsel. The matter just argued will be submitted. And the court will stand in recess for the day. Are you happy to answer questions? I don't know. I don't know, but I'd be happy to do it now. I think this was advertised as an opportunity for questions. I would be happy to talk to you about anything not having to do with any of the cases that were argued today. It might be of some interest to you just to know in brief how we, what kind of a process we follow. In our court, as you know, it's a very large court. But the briefs are in record, and all the cases are normally circulated to the panel maybe six weeks to two months before oral argument. And we individually do our preparation, conferring only about matters of procedure or timing or which cases should be perhaps submitted without oral argument. And we don't, we seldom discuss substantive issues before coming to oral argument. Then, as you saw today, we, the three of us convene for oral argument. We hear oral argument in maybe 60 percent of the cases that are normally on the argument calendar, and we will submit without argument maybe 30, 40 percent. That judgment call is made essentially on whether a case appears to be rather straightforward, already controlled by existing circuit law, or whether we believe that oral argument would be helpful. We have oral argument, as you just heard today, with a sometimes robust exchange with counsel. I think every judge approaches argument differently and perhaps expects something different out of it. And after argument, we do and we will today retire to have a conference, and the three of us will talk about the cases and arrive at a preliminary decision. And the senior judge in the majority side will assign the writing to someone. And then in due course, a proposed opinion or disposition will be circulated, and we will subject that to rather rigorous scrutiny, normally by e-mail, and arrive at an opinion which ends up in F-3rd and in some class or other of yours. But, you know, if anybody has questions, I'm sure any of us would be very happy to answer them. There's been some discussion in some of the It might help if you just said, not for formality's sake, but it's just a little hard to hear. There's been some discussion in some of the legal blogs recently about the consolidation and specialization of advocacy among lawyers who just do this, and I'm wondering if you could speak to how helpful it is or how it is differently helpful to hear from Well, it's really helpful to have people, attorneys appear before us who know what they're talking about. And, you know, there's obviously different views. I think sometimes, in some cases, it's very helpful to have another pair of eyes look at an appeal before it by somebody who didn't try the case, because when you do try it, at least I know as a trial lawyer, I couldn't get rid of my own impressions as easily. You know, I remember the witness twitching, or I remember how what a terrible ruling I thought the judge made. And it's harder to separate yourself out from those impressions. If you are independent appellate counsel looking at it, you're looking at it through the same pair of glasses that we do, which is a very cold record. It's all in black and white. So there is some merit to that. On the other hand, it is the practice in this circuit really to expect, in criminal cases at least, that the appellate lawyer have been the trial lawyer, because it's often the case that the court has questions that are very record intensive. And that's been our practice for some time. Kennedy. In my experience, it's a mixed bag as I watch the lawyers before us. Sometimes it's to the advantage of the lawyer appearing before us to be able to say, Your Honor, I was not the trial attorney, because the answer from the trial attorney was going to be awkward. But if you can say I wasn't the trial attorney and it's not in the record, that's actually a, you know, that's a legitimate answer. On the other hand, sometimes it's an advantage not to have the trial lawyer there. Other times, and it's particularly true, as Judge Reimer just said, in a fact-intensive criminal case where lots of stuff went on, to have the lawyers there who can say, Well, you know, you've got all the pieces, but here's how they fit together. That's very useful. There are different skill sets. Some people are better at trial work. Some people are better at appellate work. I think it's useful to have one more facet here. It's useful sometimes to have people who really know. If you don't have people who really know, the appellate specialist needs to really know as best you can from the record, because the worst situation to be in is when we know what went on better than he or she knows what went on. That's not a good place to be. And it's also helpful to have a sense of what happens in a trial courtroom. I've dealt with cases where people are arguing on habeas corpus and so forth, and they're trying to talk about what the potential effect on the jury is, and you discover that none of them have ever been in a trial, not just the trial of this case, a trial. And that's just very hard to project. Unless you've been in a courtroom, it's hard to understand how some of these things happen. So breadth of experience is useful, even if it's not that particular case. And I think the reverse is probably true, too. If you're a trial lawyer, you're taught to preserve the record. You probably really don't understand what that's all about unless you've been standing here and try to deal with what's it mean to have something in the record or something not in the record. And as I watch people try to say, well, we had a chambers conference, and somebody said this, but where is it in the record? It's not there. Once you've gone through that experience, you go into the trial courtroom, you'll understand better what it means to preserve. So I think there's some value in the breadth of experience, even if it's not the particular case before you. Yes? I have a question about the kind of questioning people receive. For example, in the Clementine case, I felt like the USDA coming to court received as many questions as the court did. So I was just curious about that. You know, when the court, in that question, do you already have those questions in mind I'll start on this. And I'm saying this independently of the cases that you heard here in front of you. So what I say may or may not be applicable to the particular cases. It's often the case that you question most vigorously the side that you think you're going to disagree with. And there are a couple of reasons for that. One is you may want to make sure that you've understood properly. And the other linked reason is you want to make sure that other side has had a chance to persuade you. And it's sometimes, maybe even often the case that you do not question as vigorously someone that you do agree with. Sometimes it will also happen that you're just trying to get the argument over with. And you're very thankful you're not on the D.C. Circuit hearing these cases all the time. Again, independently of these cases. Thank you, Professor. I didn't even know what a Clementine was. I have some questions in mind, but most of them come out of the argument. And a lot of times it varies depending upon what the brief is like. I mean, if the position is spelled out well in the brief, I may not have to question as much as if something has happened or if something has changed. I'll go ahead. It came out during the argument. There's been an intervening decision. Our court came out with a decision last year after the briefs were written in some unnamed case. And that had a lot bigger effect on the argument that had been offered up by one side than it did on the other. And so there was just a lot more for him to discuss and a lot more for us to inquire about because of what had happened after the briefs were written. Do you go into oral argument with an expectation of what you already think and give counsel an opportunity to change your mind? Is that the dynamic? Or do you try to go in as absolutely open as you possibly can and see what happens? And if you go in with a preconceived notion, how often have you come out with your mind changed? So I said I think every you'll probably get a slightly different answer from nearly every judge because every judge sees oral argument serving a different purpose. Personally, after I've read the briefs and read the record and read all of the pertinent authority and had the benefit of a lot of help from my law clerks on the case, I have a point of view about it. And I've always believed that the helpful and the fair thing to do is to share that point of view with counsel for the side that it's going against for the reasons that Judge Fletcher mentioned a minute ago, because I want to know whether I've got it right or whether I've got it wrong. And I have been absolutely saved from making bad mistakes by that kind of approach when somebody does say, wait a minute, that's just not correct, or gives them an opportunity to make a policy argument or some other point that can be persuasive. I would say that, you know, maybe in my experience, I've changed my mind maybe, you know, a little bit. I think the moral of the story, if I can communicate to you, the extreme importance of brief writing. You can't – oral argument can be – it's useful, it's helpful, and it can make a difference, but you can't count on it. There's not even a right to have it. So you have got to take your best shot, your most thoughtful shot and your best shot in the written work that you do. Actually, I'd like to emphasize that last piece of the answer, even though that really wasn't the question. The answer, the part of the answer where Judge Reimer emphasizes the importance of the briefs. Most cases, almost all cases, in truth, are decided on the briefs and on the record rather than that oral argument. Five percent sounds about right to me, too. And brief writing not only has to be clear and persuasive. Those are obvious things. Make it easy on the judge. Judges are terribly busy. They've got too many things to do. And if you write a brief that's got everything in it analytically but is hard to read, or you don't have your references to the record in a way that's easy to manage, or your references are not properly indexed, all those things are obstacles for the judge and therefore obstacles for your client. Ease and clarity above all other things. This sounds like a planned progression. It's not. But what this means is what many of you are going to be doing in a fairly short period of time has a lot more to do with the outcome of the appeal than what the people that you're reporting to are going to do. I remember being surprised as a young attorney, why exactly is it that we're the ones doing all this, the brief writing and so forth, and sorting out the case, and some of the senior partners are essentially editing our writing but not getting in as deep as I thought they should have, because, in fact, the tale is generally told through the brief. It's very, very difficult to rescue a losing brief by a great oral argument, because we already have in mind what the issues are about. I can think of one total case in my now close to four years in the court where I came in convinced A, and the oral argument made me convinced B. Now, there have been more cases where it was more gray in between, but basically the story is going to be told in the briefs. So you have to take what you're going to be called upon to do very seriously, and what Judge Fletcher said, make it as user-friendly as you possibly can. Make it clear, concise. Don't make it look like that law review note that you've written, because we don't want to read all those detailed footnotes, and we don't want to exclude all the theoretical possibilities direct and to the point. And that's where you're going to have the most success. What's the most common mistake you see attorneys make arguing a point? Did you say the most common or the worst? The most common. Tell me both. Geez, the most common mistake is probably not being clear. I've got to say probably both the answer is the same. I mean, not being prepared. I mean, it isn't unusual to have it happen that having reviewed the record and having reviewed the briefs and the authorities that are pertinent, the bench knows more about the discrete case than counsel. And that should never be. It should be definitely the opposite. So I would say, you know, I mean, being totally prepared and on top of the game is very, very important. People sometimes who are predominant, primarily trial lawyers, you will find try to make more of a jury argument, more of a sort of an emotion, a pitch to emotion and whatever. And that seldom, seldom works. Occasionally, I mean, another sort of common weakness of oral advocacy is not answering the question that's been asked. Maybe the question is crazy or it may be unclear, and it's perfectly okay to say, you know, I don't understand the question or could you reframe it or something. But people sometimes just figure that it's best to play ostrich and ignore it and go on to back to their script. And again, it's very important to follow the judge's line of questioning because it's that's they're asking it for a reason, even though the reason may not appear to you obvious. So those are kind of common things that can happen. I'd agree with those and add consideration of what it is we're doing here. I see cases where people are continuing a fight they had before, particularly when it's the same set of lawyers. And I've had digressions where somebody suddenly starts beefing about what happened during a discovery dispute and so forth. You've got to keep your eye on the ball. And here, the court of appeals is only going to be able to do and is only going to be interested in certain things. And we don't really care what happened in some of those digressions before. One of the advantages an appellate specialist has is being able to focus on that at the cost of not knowing as much. But the idea of taking a fresh look at this stage or getting a fresh pair of eyes at least to offer comments and suggestions is a good one. Keep in mind what you're trying to do here as opposed to what could have been done differently or you might have liked a different result last year in the trial court but it didn't happen. One additional thing, and it's usually, although not always, a mistake. I would like to tell you it's always a mistake is to misstate the record. If I catch or any judge catches somebody misstating the record, that's a major sign of trouble. And I would like to say it's always a mistake because I'll always catch you if you misstate the record. But there's a high enough risk of it that you don't want to do it. Even to the point of sort of a serious exaggeration because all of a sudden we start listening to you very differently. Yes, ma'am. Just a few questions ago you spoke about the importance of working from a good record. But it sounded like the advocates in this case, at least in the Arizona case and in the immigration case, were working with kind of shoddy records that maybe they weren't responsible for putting together. But how can an advocate present to you an appeal based on a really fragmented, really terrible record? Short answer is you do the best you can. Cases come up to us in different ways. And, again, this is not specifically commenting on the cases we had in front of us or any suggestion at all about the merits. Cases that come up to us from prisoners on habeas and civil rights cases are often fragmented records because of the procedural ways that these things show up to us. Others, when you've had a full sort of discovery, a normal civil trial, there's going to be a full record. And the art probably at that point is not so much, although it is put it in the record, there's a sort of a secondary art. What do you put in the excerpts of record? Because there's only one record. And the judge who's doing the bench memo, at least in our circuit, will have that record. The rest of us have the excerpts. So you better make sure that what you consider important is going to be in those excerpts. Thank you all for your interest in our process. We've certainly enjoyed the opportunity of being here. And we'll look forward to seeing you in court or out in the future. Thanks very much. Thank you for your attention. Thank you.
judges: Rymer, W. Fletcher, Clifton